No. 25-10842

# In the United States Court of Appeals for the Fifth Circuit

——————————

UNITED STATES EX REL. CHERYL TAYLOR,
*Appellee / Cross-Appellant,*

*v.*

HEALTHCARE ASSOCIATES OF TEXAS, LLC,
*Defendant / Appellant / Cross-Appellee.*

——————————

On Appeal from the U.S. District Court for the Northern District of Texas,
No. 3:19-cv-2486 (Hon. David C. Godbey)

——————————

**OPENING BRIEF OF DEFENDANT-APPELLANT**

——————————

Elizabeth C. Brandon
Sarah Cummings Stewart
E. Steve Smith
REED SMITH LLP
2850 N. Harwood Street, Suite 1500
Dallas, TX 75201
Tel: (469) 680-4200
ebrandon@reedsmith.com
sarah.stewart@reedsmith.com
stevessmith@reedsmith.com

R. Alan York
REED SMITH LLP
1221 McKinney St. Suite 2100
Houston, TX 77010
Tel: (713) 469-3800
ayork@reedsmith.com

R. Jeffrey Layne
REED SMITH LLP
401 Congress Avenue, Suite 1800
Austin, TX 78701
Tel: (512) 623-1801
jlayne@reedsmith.com

Kristin B. Parker
REED SMITH LLP
599 Lexington Avenue
New York, NY 10022
Tel: (212) 521-5400
kparker@reedsmith.com

M. Patrick Yingling
REED SMITH LLP
10 S. Wacker Dr., 40th Fl.
Chicago, IL 60606
Tel: (312) 207-2834
mpyingling@reedsmith.com

**Certificate of Interested Persons**

No. 25-10842

# In the United States Court of Appeals for the Fifth Circuit

———————

UNITED STATES EX REL. CHERYL TAYLOR,
*Appellee / Cross-Appellant,*

*v.*

HEALTHCARE ASSOCIATES OF TEXAS, LLC,
*Defendant / Appellant / Cross-Appellee.*

———————

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case:

1.  Defendant Healthcare Associates of Texas, LLC

2.  Counsel for Defendant Healthcare Associates of Texas, LLC:

    a.  R. Alan York, REED SMITH LLP

    b.  Elizabeth C. Brandon, REED SMITH LLP

    c.  R. Jeffrey Layne, REED SMITH LLP

    d.  Sarah C. Stewart, REED SMITH LLP

    e.  M. Patrick Yingling, REED SMITH LLP

    f.  Steve Smith, REED SMITH LLP

i

g.   Kristin B. Parker, REED SMITH LLP

h.   Megan A. Hudgeons, REED SMITH LLP (in the district court)

i.   Stephen J. McConnell, REED SMITH LLP (in the district court)

j.   Jason M. Crawford, CROWELL & MORING (in the district court)

k.   Jennifer S. Romano, CROWELL & MORING (in the district court)

3.   Relator Cheryl Taylor

4.   Counsel for Relator Cheryl Taylor:

a.   Catherine Elizabeth Gaither, JOHNSTON CLEM GIFFORD PLLC

b.   Robert W. Gifford, JOHNSTON CLEM GIFFORD PLLC

c.   Daniel S. Klein, JOHNSTON CLEM GIFFORD PLLC (in the district court)

d.   Gordon Welborne Green, JOHNSTON CLEM GIFFORD PLLC (in the district court)

e.   Thomas Samuelson, JOHNSTON CLEM GIFFORD PLLC (in the district court)

5.   United States of America

6.   Counsel for United States of America:

a.   Daniel Winik

b.   Brian Walters Stoltz (in the district court)

ii

c.      Richard J. Guiltinan (in the district court)

These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

Respectfully Submitted,

*/s/ R. Alan York*

R. Alan York
REED SMITH LLP
1221 McKinney St., Suite 2100
Houston, TX 77010
Tel: (713) 469-3800
ayork@reedsmith.com

iii

## Statement Regarding Oral Argument

This Court should schedule oral argument so that the parties may further assist the Court in resolving the issues presented on appeal, which follows a multi-week trial on novel False Claims Act theories that resulted in a more than $16 million judgment for the Relator and involves important issues regarding the unconstitutionality of the False Claims Act's *qui tam* device.

## Table of Contents

**Page**

Introduction ............................................................................................1

Jurisdictional Statement ........................................................................4

    A.    District Court's jurisdiction...........................................................4

    B.    Court of Appeals' jurisdiction ......................................................5

Statement of Issues Presented for Review............................................5

Statement of the Case ............................................................................6

    A.    Factual background......................................................................6

        1.    HCAT is a primary care provider. .......................................6

        2.    HCAT's clinics were comprised of departments overseen by medical directors..................................................7

        3.    HCAT's physicians were always physically present and immediately available to advanced practice providers. ................................................................................9

        4.    HCAT properly credentialed its providers with Medicare. ...........................................................................10

    B.    Procedural history .....................................................................10

Summary of the Argument...................................................................14

Standard of Review..............................................................................20

Argument ..............................................................................................21

    A.    Relator failed to meet her materiality burden............................21

B.    The district court allowed Relator to submit legally invalid theories to the jury, and it cannot be determined if the verdict was based on one of the invalid theories. ................................................................31

    1.    Relator's reverse FCA claim is legally deficient. ...............34

    2.    Relator's "split billing" liability theory is legally deficient. ................................................................42

    3.    Relator's "incident-to" liability theory is legally deficient. ................................................................47

    4.    Relator's "uncredentialed" liability theory is legally deficient. ................................................................50

C.    The FCA's qui tam device violates Article II's Vesting and Take Care Clauses as well as the Appointment Clause. ................................................................53

    1.    The FCA's *qui tam* device violates the Vesting and Take Care Clauses. ................................................................57

    2.    The FCA's *qui tam* device violates the Appointments Clause. ................................................................62

    3.    This panel should vote for the entire Court to address this issue. ................................................................69

Conclusion................................................................71

# Table of Authorities

**Page(s)**

## Cases

*Allison Engine Co. v. U.S. ex rel. Sanders,*
  553 U.S. 662 (2008)............................................................................21

*Buckley v. Valeo,*
  424 U.S. 1 (1976)..................................................................57, 63, 64

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
  561 U.S. 477 (2010)..............................................................57, 59, 62

*Freytag v. Comm'r,*
  501 U.S. 868 (1991)..............................................................................68

*In re Grand Jury Investigation,*
  916 F.3d 1047 (D.C. Cir. 2019)................................................67, 68

*Hawaii ex rel. Torricer v. Liberty Dialysis-Hawaii LLC,*
  512 F. Supp. 3d 1096 (D. Haw. 2021)..........................................40

*Hughes Aircraft Co. v. U.S. ex rel. Schumer,*
  520 U.S. 939 (1997)..............................................................................62

*Kicklighter v. Nails by Jannee, Inc.,*
  616 F.2d 734 (5th Cir. 1980)............................................*passim*

*Kroger Co. v. Roadrunner Tranp., Inc.,*
  634 F.2d 228 (5th Cir. 1981)..........................................................31

*Lucia v. SEC,*
  585 U.S. 237 (2018)....................................................................63, 66

*Marsh v. Chambers,*
  463 U.S. 783 (1983)..............................................................................61

*McClinton v. Southerncare, Inc.*,
  No. 3:16-cv-128, 2021 U.S. Dist. LEXIS 117055 (S.D. Miss.
  June 23, 2021) ..................................................................................40

*Morrison v. Olson*,
  487 U.S. 654 (1988)...............................................................57, 64, 67

*Munn v. Algee*,
  924 F.2d 568 (5th Cir. 1991) ..........................................................21

*Nowell v. Universal Elec. Co.*,
  792 F.2d 1310 (5th Cir. 1986)...................................................*passim*

*Ortega v. Off. of the Comptroller of the Currency*,
  155 4th 394, 402 (5th Cir. 2025) ....................................................21

*Pan E. Expl. Co. v. Hufo Oils*,
  855 F.2d 1106 (5th Cir. 1988).........................................................34

*Pierce v. Ramsey Winch Co.*,
  753 F.2d 416 (5th Cir. 1985)...........................................................30

*Reed v. Goertz*,
  136 F.4th 535 (5th Cir. 2025)..........................................................68

*Reeves v. AcroMed Corp.*,
  44 F.3d 300 (5th Cir. 1995)......................................................*passim*

*Riley v. St. Luke's Episcopal Hospital*,
  252 F.3d 749 (5th Cir. 2001)....................................................*passim*

*Seila Law LLC v. CFPB*,
  591 U.S. 197 (2020)...................................................................57, 65

*Skidmore v. Precision Printing & Packaging, Inc.*,
  188 F.3d 606 (5th Cir. 1999)....................................................20, 31

*Smith v. Southern Airways, Inc.*,
    556 F.2d 1347 (5th Cir. 1977)........................................................*passim*

*Sturgeon v. Pharmerica Corp.*,
    438 F. Supp. 3d 246 (E.D. Pa. 2020)...............................................39

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)........................................................................58

*U.S. ex rel. Gentry v. Encompass Health Rehab. Hosp. of Pearland,*
    *L.L.C.*,
    157 F.4th 758 (5th Cir. Nov. 3, 2025).....................................4, 56, 70

*U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*,
    839 F.3d 242 (3d Cir. 2016)............................................................34

*U.S. ex rel. Foreman v. AECOM*,
    19 F.4th 85 (2d Cir. 2021)...............................................................35

*U.S. ex rel. McBride v. Halliburton Co.*,
    848 F.3d 1027 (D.C. Cir. 2017)......................................................22

*United States v. Berkeley Heartlab, Inc.*,
    247 F. Supp. 3d 724 (D.S.C. 2017)..................................................40

*United States v. Catholic Health Initiatives*,
    No. 4:18-cv-123, 2022 U.S. Dist. LEXIS 122157 (S.D. Tex. Mar.
    31, 2022) ....................................................................................35, 41

*United States v. Donziger*,
    38 F.4th 290 (2d Cir. 2022)..............................................................67

*United States v. Germaine*,
    99 U.S. 508 (1879)......................................................................63, 66

*Universal Health Services v. U.S. ex rel. Escobar*,
    579 U.S. 176 (2016).................................................................*passim*

*U.S. ex rel. Aldridge v. Corp. Mgmt.*,
78 F.4th 727 (5th Cir. 2023)....................................................................22, 25, 29

*U.S. ex rel. Harman v. Trinity Indus.*,
872 F.3d 645 (5th Cir. 2017)..........................................................................*passim*

*U.S. ex rel. Integra Med Analytics, LLC v. Creative Sols in Healthcare, Inc.*,
SA-17-CV-1249-XR (W.D. Tex. Nov. 13, 2019)............................................41

*U.S. ex rel. Montcrief v. Peripheral Vascular Assocs., P.A.*,
133 F.4th 395 (5th Cir. 2025)........................................................................*passim*

*U.S. ex rel. Myers v. America's Disabled Homebound, Inc.*,
No. 14-8525, 2018 U.S. Dist. LEXIS 47087 (N.D. Ill. Mar. 22, 2018) ........................................................................................................40

*U.S. ex rel. Polansky v. Executive Health Resources, Inc.*
599 U.S. 419 (2023)...................................................................................55, 61

*U.S. ex rel. Porter v. Magnolia Health Plan, Inc.*,
810 F. App'x 237 (5th Cir. 2020) ....................................................................22

*U.S. ex rel. Scharber v. Golden Gate Nat'l Senior Care LLC*,
135 F. Supp. 3d 944 (D. Minn. 2015)..............................................................40

*U.S. ex rel. Thomas v. Siemens AG*,
708 F. Supp. 2d 505 (E.D. Pa. 2010)...............................................................35

*U.S. ex. rel. Zafirov v. Florida Medical Assocs., LLC*,
751 F. Supp. 3d 1293 (M.D. Fla. 2024) ....................................................*passim*

*Vermont Agency of Natural Resources v. U.S. ex rel. Stevens*,
529 U.S. 765 (2000)..................................................................................54, 67

*Walther v. Lone Star Gas Co.*,
952 F.2d 119 (5th Cir. 1992)..........................................................................34

x

*Wisconsin Bell, Inc. v. U.S. ex rel. Heath*,
    145 S. Ct. 498 (2025)........................................................................55

**Constitutional Provisions**

U.S. Const. Article II, § 1, cl. 1 ......................................................57

U.S. Const. Article II, § 2, cl. 2 ......................................................62

U.S. Const. Article II, § 3 ................................................................57

**Statutes**

28 U.S.C. § 1331................................................................................4

29 U.S.C. § 1291................................................................................5

31 U.S.C. § 3729................................................................................5

31 U.S.C. § 3729(a)(1) .....................................................................63

31 U.S.C. § 3729(a)(1)(A).................................................................12

31 U.S.C. § 3729(a)(1)(B) .................................................................12

31 U.S.C. § 3729(a)(1)(G) ...........................................................12, 40

31 U.S.C. § 3729(b)(3) .....................................................................39

31 U.S.C. § 3729(b)(4) .....................................................................21

31 U.S.C. § 3730(b)......................................................................63, 67

31 U.S.C. § 3730(b)(1) .....................................................................58

31 U.S.C. § 3730(b)(2) .....................................................................64

31 U.S.C. § 3730(b)(4) .....................................................................64

31 U.S.C. § 3730(b)(5) .....................................................................63

31 U.S.C. § 3730(c) ............................................................................59

31 U.S.C. § 3730(c)(1) .......................................................................58

31 U.S.C. § 3730(d) ............................................................................67

**Regulations**

42 C.F.R. § 410.26 .............................................................................49

42 C.F.R. § 410.26(a)(1)......................................................................48

42 C.F.R. § 410.26(a)(2)............................................................48, 49, 52

42 C.F.R. § 410.26(a)(7)......................................................................48

42 C.F.R. § 410.26(b) .........................................................................47

42 C.F.R. § 410.26(b)(5) ................................................................48, 58

42 C.F.R. § 410.32(b) .........................................................................44

42 C.F.R. § 410.32(b)(3)(i) ..............................................................45, 46

42 C.F.R. § 410.32(b)(3)(ii) ........................................................48, 49, 52

42 C.F.R. § (b)(1)-(9) .........................................................................48

**Rules**

Fed. R. App. P. 40 ............................................................................70

Fed. R. Civ. P. 50(a) ..........................................................................20

Fed. R. Civ. P. 50(b)..........................................................................20

**Other Authorities**

9 C. Wright & A. Miller, Federal Practice and Procedure: Civil
    § 2556 (1971) .............................................................................31

Charles Doyle, Congressional Research Service, R40785, *Qui Tam: The False Claims Act and Related Federal Statutes* (Apr. 26, 2021) ..........................................................................................62

*Constitutionality of the Qui Tam Provisions of the False Claims Act*, 13 Op. O.L.C. 207 (1989)..............................................................54

*Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73 (2007)................................................................54

*The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124 (1996)..............................................................54

Nat'l. Unif. Claim Comm., *1500 Health Insurance Claim Form Reference Instruction Manual for Form Version 02/12* (Version 3.0, July 2015) ...........................................................................43

**Introduction**

This case illustrates the constitutional morass created by the False Claims Act's *qui tam* device, which allowed an unappointed private party to assert invalid liability theories on behalf of the United States (the "Government") and seek trebled damages and civil penalties, all without Government approval or oversight.

In this matter, Relator Cheryl Taylor asserted multiple invalid False Claims Act theories against her former employer, Healthcare Associates of Texas, LLC ("HCAT"). The Government, after conducting a fulsome review of the allegations and HCAT's documentation, declined to intervene and pursue Relator's claims against HCAT. In fact, after learning of and investigating Relator's allegations, the Government continued to pay HCAT's claims all of the way through trial in this case.

The district court permitted Relator to ask the jury for relief on at least 15 different liability theories, many of which are foreclosed by settled law. The district court also refused separate verdict-form interrogatories for each theory, rendering it impossible to determine whether the jury relied on a

valid theory. The jury returned a verdict for Relator, finding that HCAT submitted 21,844 false claims, resulting in $2,753,641.86 in actual damages. After trebling the damages and including civil penalties of $8,260,925.58, the district court entered judgment for Relator in the amount of $16,521,851.16, plus interest.

This Court should reverse and render judgment for HCAT. Relator failed to prove an essential element of her claims: materiality. That is, Relator failed to prove that the alleged falsity of HCAT's claims mattered to the Government's payment decision. Under settled precedent, if the Government continues paying claims after learning of noncompliance with a certain requirement, that is "very strong evidence" that the requirement is not material, and continued payment by the Government after it learns of an alleged fraud "substantially increases" the burden on the relator in establishing materiality.

Relator did not meet her substantially increased burden. Relator did not even present a Government witness to explain how HCAT's alleged noncompliance could be material when the Government continued paying

2

HCAT's claims after learning of and investigating Relator's allegations. At a minimum, the Court should remand for a new trial because the district court refused to instruct the jury on the legal standard for materiality when the Government continues to pay claims after learning about a relator's allegations, which unfairly prejudiced HCAT.

Alternatively, this Court should vacate and remand for a new trial because the district court allowed Relator to submit legally invalid theories to the jury and refused to allow separate verdict-form interrogatories for each theory—thus rendering it impossible to determine if the verdict was based on one of the invalid theories. Under settled law, a single question containing multiple theories of liability is permissible *only* if each of the theories is legally sound.

Finally, this Court should reverse and render judgment for HCAT because the *qui tam* device under which Relator brings her claims violates multiple clauses of Article II of the Constitution—both on its face and as applied to this case, where the Government declined to intervene. *First*, it violates the Vesting and Take Care Clauses because it allows a relator to

3

exercise power outside the supervision or control of the Executive Branch. *Second*, it violates the Appointments Clause because it allows a relator to function as an officer of the United States without being appointed through a constitutionally prescribed process.

To the extent this panel concludes that existing Fifth Circuit case law precludes a ruling that the FCA's *qui tam* device is unconstitutional, HCAT respectfully requests that the panel (or any individual panel member) request a poll for the entire Fifth Circuit to hear this issue *en banc*, a point urged in two recent opinions of two members of this Court. *See U.S. ex rel. Montcrief v. Peripheral Vascular Assocs., P.A.*, 133 F.4th 395, 412 (5th Cir. 2025) (Duncan, J., concurring); *U.S. ex rel. Gentry v. Encompass Health Rehab. Hosp. of Pearland, L.L.C.*, 157 F.4th 758, 766 (5th Cir. Nov. 3, 2025) (Ho, J., concurring).

## Jurisdictional Statement

### A.    District Court's jurisdiction

The district court had subject matter jurisdiction under 28 U.S.C. § 1331, which grants the district courts "original jurisdiction of all civil

actions arising under the . . . laws . . . of the United States." Relator's suit against Defendants was based on 31 U.S.C. § 3729 (the "False Claims Act" or "FCA").

## B.    Court of Appeals' jurisdiction

This Court has jurisdiction under 29 U.S.C. § 1291. The judgment that disposed of all claims against all parties was entered on February 26, 2025. ROA.6057-58. Defendants filed a timely Motion for New Trial and Motion for Judgment as a Matter of Law on March 26, 2025. ROA.7566-68, 7610. The district court denied the Motions on July 8, 2025. ROA.8863-75. Defendants filed their timely Notice of Appeal on July 11, 2025, ROA.8876-78, and Relator filed her Notice of Cross-Appeal on July 25, 2025, ROA.8879-80.

## Statement of Issues Presented for Review

1.    Whether judgment as a matter of law is warranted because Relator failed to satisfy the materiality element of her claims under the False Claims Act? *Suggested Answer: Yes.*

2.    Whether a new trial is warranted because the district court refused to instruct the jury on the materiality standard that applies when the

5

Government continues paying claims after learning of an alleged fraud?

*Suggested Answer: Yes.*

3.      Whether a new trial is warranted because the district court allowed the jury to consider invalid liability theories and combined all of the theories into a single jury question, making it impossible to determine whether the jury relied on a valid legal theory? *Suggested Answer: Yes.*

4.      Whether judgment as a matter of law is warranted because the False Claims Act's *qui tam* device violates the Vesting, Take Care, and Appointments Clauses of Article II of the U.S. Constitution? *Suggested Answer: Yes.*

<b>Statement of the Case</b>

**A.    Factual background**

**1.    HCAT is a primary care provider.**

HCAT is a primary care provider with locations throughout the Dallas area. At its inception, HCAT operated a single location, but over time the organization expanded to 15 clinics regionally. *See* ROA.10333:7-9. At its height in 2023, HCAT employed 75 providers, comprised of equal numbers

6

of physicians and Advanced Practice Providers (*i.e.,* nurse practitioners

("NPs") and physician assistants ("PAs")). *See* ROA.10333:15-18.

HCAT utilizes a patient-focused model that emphasizes preventative

care (instead of reactive care) with the goal of improving patient outcomes.

From the start, HCAT's mantra was to internalize services that benefited its

patients, meaning that HCAT sought to provide as many services in-house

as possible, to avoid the need for patients to schedule multiple appointments

with different providers to reach the same goal. *See* ROA.10329:19-10330:1.

This approach not only achieved efficiency in patient care but also improved

patient compliance and outcomes and reduced costs for patients and the

overall healthcare system. *See* ROA.10330:2-4.

**2.    HCAT's clinics were comprised of departments overseen by medical directors.**

HCAT physicians were responsible for ordering necessary services for

patients, identifying the appropriate diagnosis and Current Procedural

Terminology ("CPT") codes, and documenting the medical record

accordingly. *See* ROA.10335:9-14. HCAT's billing staff were responsible for

reviewing the CPT codes associated with a particular claim and confirming that the codes were supported by the medical record. *See* ROA.10335:15-17.

Each clinic was comprised of multiple departments (*e.g.*, moderate complexity laboratory, radiology/imaging, and physical medicine) to offer maximum flexibility and efficiency to patients. Two of HCAT's clinics had a radiology department, offering complex imaging such as CT scans, MRIs, and ultrasounds. *See* ROA.10336:9-12. HCAT assigned a medical director to each of its internal departments to oversee the overall operations and billed claims for services under the relevant medical director. For example, Dr. Charles Powell served as the medical director for the laboratory department, and all claims for laboratory services were billed under his name; Dr. Walter Gaman served as the medical director for the imaging department, and all claims for imaging services were billed under his name; and Dr. Terrence Feehery served as the medical director for the physical medicine department, and certain claims for physical medicine services were billed under his name. *See* ROA.10336:20-10337:8, 10439:16-18. With respect to claims for imaging services, HCAT billed for the technical component of the

study, and the radiology group billed for the professional component of the service. *See* ROA.10336:15-19.

### 3.    HCAT's physicians were always physically present and immediately available to advanced practice providers.

HCAT's clinics were organized in "pods," which were physical areas within the clinic where a physician, his or her supporting PA or NP, and medical assistants worked as a team to treat patients. *See* ROA.10423:20-10424:2. For example, in Irving, there were two levels, with imaging, the pharmacy, and the physical medicine department on the first floor and the primary clinic on the second floor. *See* ROA.10487:12-10488:23. The primary clinic had a waiting room in the center of the building, with a long hallway containing five "pods" on each side. *See* ROA.10488:14-18.

While PAs and NPs might conduct patient visits on their own (within the scope of their licensure), the physician with whom they primarily worked—or another physician in a nearby pod—was always physically present and available to assist if a question or issue arose. *See* ROA.10425:4-9, 10489:19-10490:14; *see also* ROA.16053.

### 4.    HCAT properly credentialed its providers with Medicare.

Because many of the providers HCAT hired were already credentialed with Medicare, only a reassignment of benefits was required before CMS could start directing reimbursement to HCAT for services provided to Medicare patients by HCAT providers. *See* ROA.10836:14-17. For providers hired by HCAT who were not already credentialed with Medicare, HCAT obtained the necessary information from the provider and submitted the enrollment application to Medicare. *See* ROA.10836:18-25.

### B.    Procedural history

Relator filed suit in October 2019, alleging that HCAT employed fraudulent Medicare billing practices. *See* ROA.82. On August 14, 2020, the Government issued a Civil Investigative Demand ("CID") to HCAT, seeking certain business records and claims data as well as medical records for a specific list of patients, and HCAT produced tens of thousands of pages of patient files and claims data to the Government.

On June 21, 2021, after almost two years of investigating Relator's allegations, the Government issued a Notice of Non-Intervention. ROA.111-13. No Government agency demanded or requested that HCAT return funds

received for an overpayment arising from Relator's allegations. While the Government was investigating Relator's claims, throughout the relevant period (until December 31, 2021), and even all the way through trial in November 2024, the Government continued to pay HCAT's claims. ROA.10376:4-23, 10538:17-10539:25, 11397:5-25.

Relator initially alleged seven categories of false claims. *See* ROA.1486. At trial, however, Relator attempted to prove only five categories. Specifically, through her expert, Melissa Scott, Relator advanced the following categories and number of corresponding claims at trial:

| Category | Number of Claims |
|---|---|
| Uncredentialed and unlicensed providers | 9,908 |
| Physical Exam Preparation ("PEP") claims | 3,469 |
| Medical Assistant ("MA") documentation claims | 8,588 |
| Wrong provider ("split billing") claims | 24,740 |
| "Incident-to" claims | 5,985 |

ROA.9951:4-9.

During closing argument, Relator's counsel conceded that Relator was not entitled to recover on her "uncredentialed" theory (the first category listed above) to the extent that theory was based on HCAT submitting

11

physical therapy claims. ROA.11484-85. Accordingly, in closing argument, Relator's counsel reduced the claims in the first category to 4,456 and asked the jury to find that Defendants submitted a total number of 41,669 false claims. *See* ROA.11485:6-9.

Over HCAT's objection (ROA.11409:16-11410:12, 11417:17-11418:16), the district court crafted a broad first verdict-form question that asked the jury whether any of the Defendants violated the FCA, without regard to any specific liability theory. ROA.5905.[1] Question 1 encompassed claims based on three separate FCA provisions: (1) false claims, 31 U.S.C. § 3729(a)(1)(A); (2) false records, 31 U.S.C. § 3729(a)(1)(B); and (3) reverse false claims, 31 U.S.C. § 3729(a)(1)(G). *See* ROA.5905-12. For this broad question, the verdict form further instructed the jury on the seven different categories of "fraud" that Relator initially asserted, even though Relator advanced only five

---

[1] Although the court instructed the jury not to double-count claims in connection with deciding the *amount* of actual damages, *see* ROA.5920, 11478:17-21, 11479:13-23, no such instruction was provided (despite HCAT's objection) in connection with the earlier instruction regarding double-counting the *number* of false claims in Question No. 2. *See* ROA.5913, 11442:18-11445:3.

categories at trial. This single question, therefore, spanned at least *15 different liability theories*.



The district court also refused to instruct the jury on the legal effect (in terms of materiality) of the Government continuing paying claims after learning of an alleged fraud. ROA.11436:12-11437:4, 5810, 5908.

On November 18, 2024, the jury reached a verdict, finding that HCAT violated the FCA and knowingly submitted 21,844 false claims, about half the number of claims Relator argued to the jury. ROA.5913. The verdict form does not specify which claims or theories comprise the 21,844 purported false claims. *See id.*

13

On December 2, 2024, Relator filed her Motion for Entry of Judgment. ROA.5935-36, 5937-58. On February 26, 2025, the district court entered final judgment against HCAT in the amount of $8,260,925.58 in treble damages (from a total actual damage amount of $2,753,641.86) and $8,260,925.58 in civil penalties, totaling $16,521,851.16. ROA.6056, 6057. On March 26, 2025, HCAT filed its Motion for Judgment as a Matter of Law, ROA.7607-09, 7611-42, and its Motion for a New Trial, ROA.7566-68, 7570-7600. The district court denied both motions on July 8, 2025. ROA.8863-75.

## Summary of the Argument

**(A)** This Court should reverse and render judgment for HCAT. Materiality is an essential element of an FCA claim. A relator must prove that the alleged falsity mattered to the Government's decision to pay a claim. If the Government continues paying claims after learning of noncompliance with a certain requirement, that is "very strong evidence" that the requirement is not material, and continued payment by the Government after it learns of an alleged fraud "substantially increases" the burden on the relator in establishing materiality. To meet this substantially increased

14

burden, a relator must show how the alleged noncompliance is still material to the Government's payment decision, despite the Government's continued payments.

Relator failed to meet her materiality burden. During the relevant period (and all of the way through trial), the Government knew about Relator's allegations and continued to pay HCAT. Relator presented no evidence to explain how HCAT's alleged noncompliance could be material to the Government's payment decisions, given that the Government continued to pay HCAT's claims for years after learning of and investigating Relator's allegations. Relator did not even attempt to offer a Government witness to prove the materiality element.

The district court, however, declined to enter judgment for HCAT on this basis. The district court ruled that testimony from a former administrator (Dr. Sunil Lalla) of a third-party Medicare Administrative Contractor or "MAC" (Novitas) was sufficient evidence of what was material to *the Government*. Dr. Lalla, however, did not provide any relevant testimony on this issue. He testified that, upon learning of fraud allegations,

15

Novitas will continue paying on behalf of the Government until the Government decides to stop paying or a court decides the merits of the allegations. Dr. Lalla did not testify to *the Government's* practices. Nor could Dr. Lalla have so testified—he admitted that he lacked the authority to testify on behalf of the Government or even Novitas for that matter. As such, Dr. Lalla's testimony is entirely irrelevant.

At a minimum, the Court should vacate and remand for a new trial because the district court refused to instruct the jury on an essential part of the materiality standard—*i.e.*, if the Government continues paying claims after learning of noncompliance with a certain requirement, that is "very strong evidence" that the requirement is not material, and continued payment by the Government after it learns of an alleged fraud "substantially increases" the burden on the relator in establishing materiality. The jury was left without needed guidance on how to evaluate the Government's continued payments.

**(B)** Alternatively, this Court should vacate and remand for a new trial because the district court allowed Relator to submit legally invalid theories

16

to the jury, and it cannot be determined if the verdict was based on one of the invalid theories. This Court has explained that a single question containing multiple theories of liability is permissible *only* if each of the several theories is legally sound. Here, the district court crafted jury questions that allowed the jury to find HCAT liable for 21,844 false claims based on any one of at least 15 different liability theories, many of which are invalid.

Notably, Relator's theory based on the alleged failure to repay money owed to the Government (a "reverse FCA claim") is legally deficient and should not have been submitted to the jury. Relator submitted that HCAT was liable for the submission of false claims and that HCAT was *also* liable for not repaying money it received from the submission of those same allegedly false claims. However, courts across the country have held that a reverse FCA claim is not actionable when it is based on allegations that a defendant "failed to refund" the same claims that form the basis of a relator's affirmative FCA claim.

Because Relator's reverse FCA claim is combined with her other theories of recovery, it is impossible for this Court to determine whether the jury's verdict was based—in whole or in part—upon this legally non-viable theory. The same is true with respect to multiple other liability theories that the district court allowed the jury to consider.

**(C)** Finally, this Court should reverse and render judgment for HCAT because the *qui tam* device under which Relator brings her claims is unconstitutional on its face and as applied to this case, where the Government declined to intervene or even try to rein in Relator's case.

*First*, the FCA's *qui tam* device violates the Vesting and Take Care Clauses. The FCA vests core executive power in the hands of private parties by allowing them to litigate on behalf of the Government. And relators exercise such power outside the supervision or control of the Executive Branch. Relators thus intrude on the President's authority to execute the laws and his duty to take care that the laws are faithfully executed.

*Second*, the FCA's *qui tam* device violates the Appointments Clause. Relators wield one of the most significant forms of executive power: the

power to litigate on the Government's behalf. And they hold continuing positions that are a permanent fixture under the statute and can span years of litigation. But although relators function as officers of the United States, they are not appointed through the constitutionally prescribed process and thus cannot exercise power consistent with the Appointments Clause.

This case illustrates what can happen when these constitutional safeguards are not enforced. Although the Government investigated Relator's allegations, declined to intervene, and continued to pay HCAT's claims, the *qui tam* device nonetheless allowed Relator to advance multiple facially invalid legal theories on behalf of the Government without any accountability to the Government.

To the extent this panel concludes that this case is controlled by *Riley v. St. Luke's Episcopal Hospital*, 252 F.3d 749 (5th Cir. 2001), HCAT respectfully requests that the panel request a poll for the entire Fifth Circuit to hear this issue *en banc*. Judge Kyle Duncan and Judge James Ho of this Court have both recently acknowledged that *en banc* consideration is warranted on this issue.

19

## Standard of Review

Judgment as a matter of law is proper on an issue if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a), (b). This Court employs *de novo* review of a district court's denial of a Rule 50(b) motion for judgment as a matter of law. *See U.S. ex rel. Harman v. Trinity Indus.*, 872 F.3d 645, 652 (5th Cir. 2017).

A new trial is warranted if the jury charge leaves "substantial and ineradicable doubt whether the jury has been properly guided in its deliberations." *Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 614 (5th Cir. 1999) (citation omitted). A new trial is also required "if the [district] court erroneously submitted one of the legal theories of recovery to the jury and the form of the interrogatory prevents [this Court] from determining upon which theory the jury based its verdict." *Reeves v. AcroMed Corp.*, 44 F.3d 300, 303 (5th Cir. 1995). "When reviewing the disposition of a new trial motion, we normally reverse the judgment only for an abuse of discretion. However, when the district court's ruling is predicated on its

20

view of a question of law, it is subject to *de novo* review." *Munn v. Algee*, 924

F.2d 568, 575 (5th Cir. 1991).

Constitutional issues, as presented here, are questions of law that are

reviewed *de novo. See Ortega v. Off. of the Comptroller of the Currency*, 155 4th

394, 402 (5th Cir. 2025).

**Argument**

**A.    Relator failed to meet her materiality burden.**

A false statement is "material" if it has "a natural tendency to

influence, or be capable of influencing, the payment or receipt of money or

property." 31 U.S.C. § 3729(b)(4). In *Universal Health Services v. U.S. ex rel.*

*Escobar*, the Supreme Court clarified that, because of the materiality

requirement, "'[t]he False Claims Act is not an all-purpose antifraud statute'

or a vehicle for punishing garden-variety breaches of contract or regulatory

violations." 579 U.S. 176, 194 (2016) (quoting *Allison Engine Co. v. U.S. ex rel.*

*Sanders*, 553 U.S. 662, 672 (2008)). The materiality requirement is

"demanding," "stringent," and "rigorous." *Id.* at 192, 194, 195 n.6.

Materiality "cannot be found where noncompliance is minor or

insubstantial." *Id.* at 194. "[I]f the Government pays a particular claim in full

21

despite its actual knowledge that certain requirements were violated, that is *very strong evidence* that those requirements are not material." *Id.* at 195 (emphasis added).

Based on *Escobar*'s demanding materiality standard, this Court has recognized that "continued payment by the federal government after it learns of the alleged fraud *substantially increases* the burden on the relator in establishing materiality." *Harman*, 872 F.3d at 663 (emphasis added); *U.S. ex rel. Porter v. Magnolia Health Plan, Inc.*, 810 F. App'x 237, 242 (5th Cir. 2020) (same). According to this Court, "we have the benefit of hindsight and should not ignore what actually occurred.'" *Harman*, 872 F.3d at 667-68 (quoting *U.S. ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1034 (D.C. Cir. 2017)).

To overcome the "substantially increase[d]" burden that exists when the Government continued to pay a defendant's claims after learning of the alleged fraud, a relator must prove that the Government's continued payment does not reflect a lack of materiality. *See Harman*, 872 F.3d at 665; *c.f.*, *U.S. ex rel. Aldridge v. Corp. Mgmt.*, 78 F.4th 727, 738 (5th Cir. 2023)

22

(affirming materiality despite continued Government payment where relator showed that without continued reimbursements, a critical access hospital "would have probably closed" and that "[s]topping reimbursements upon the first allegations of fraud would thus have undermined CMS's goal of *sustaining healthcare access* for underserved rural patients") (emphasis added).

Here, the evidence shows that the Government continued to pay HCAT after it investigated the alleged fraud. Relator's operative complaint extends the timeline of Relator's claims through December 31, 2021. ROA.997-1003; *see also* ROA.9578:13-25. By that time, the Government had been on notice of Relator's allegations for *more than two years*. Relator filed this suit in October 2019 (*see* ROA.82), after which the Government conducted an extensive and lengthy investigation centering on the fraud Relator alleged. As a result of this investigation, the Government had more than a mere awareness of Relator's fraud allegations. For almost two years, it had extensive documentation from HCAT relating to the very allegations made by Relator, all before the Government decided not to intervene.

In June 2021, the Government issued its Notice of Non-Intervention, ROA.111, and the Government has not taken any action against HCAT.[2] While the Government was investigating Relator's claims—and all the way through December 31, 2021 (the period during which Relator alleges that HCAT engaged in fraud)—*the Government continued to pay HCAT's claims.* ROA.10376:4-23, 10538:17-10539:25, 11397:5-25. Indeed, the Government continued paying similar claims submitted by HCAT all the way through trial in November 2024. ROA.11397:14-11398:6. Because the Government continued to pay after learning of and investigating Relator's allegations, this is "very strong evidence" that Relator's alleged violations are not material, *Escobar*, 579 U.S. at 195, and it "substantially increases the burden on the relator in establishing materiality." *Harman*, 872 F.3d at 663.

Relator failed to overcome that substantially increased burden. Relator presented no evidence that her fraud allegations were material despite the Government's continued payments. Relator did not offer testimony from

---

[2] The Government has intervened on appeal only to defend the constitutionality of the FCA's *qui tam* device and to address application of the Excessive Fines Clause to the penalties imposed under the FCA.

any Government witness contending that the continued payments do not reflect the lack of materiality of Relator's allegations. Unlike in *Aldridge*, for example, Relator presented no evidence that the Government continued paying because it was worried about HCAT closing and being able to sustain healthcare access for underserved patient populations. *See* 78 F.4th at 737-38.

This Court's decision in *Harman* is controlling on these facts, and Relator has never argued otherwise. In *Harman*, a jury found a defendant liable under the FCA. *See* 872 F.3d at 651. On appeal, the defendant argued that the relator failed to prove materiality. This Court acknowledged that "[m]ateriality under the FCA has been a topic of increasing scrutiny since the Supreme Court's decision in *Escobar*." *Id.* at 660. Relying on *Escobar* and decisions from other circuits, this Court ruled that "continued payment by the federal government after it learns of the alleged fraud substantially increases the burden on the relator in establishing materiality." *Id.* at 663. The Court then reversed and rendered judgment for the defendant. *Id.* at 670.

According to the Court, "[w]hile [the Government's] decision to continue reimbursing ET-Plus units would be undermined if, as Harman

alleges, [the Government] acted unaware of the facts claimed to be fraud, undisputed evidence in the record does not bear that out." 872 F.3d at 665. "Nor has Harman come forward with any evidence that [the Government's] decision was procured wrongfully—through collusion between Trinity and [the Government] or some other form of corruption." *Id.* at 668.

It is the same here. The undisputed evidence shows that the Government was aware (for more than two years) of the facts that Relator claims to be fraud and actively investigated the basis of those claims, yet the Government continued to pay HCAT during the relevant period and up through the time of trial. ROA.10376:4-23, 10538:17-10539:25, 11397:5-25. And Relator presented no evidence that the Government continued to pay HCAT because of collusion or corruption or any other reason that could explain how the Government's continued payment does not reflect the non-materiality of the alleged fraud.

The district court erred in its analysis of this issue. HCAT raised this fatal deficiency in its Rule 50(a) motion for judgment as a matter of law at trial, ROA.5670-71, 5689-91, and HCAT raised the issue again in its Rule 50(b)

26

motion for judgment as a matter of law after trial. ROA.7607-08, 7618-22. The district court denied these JMOL motions without addressing HCAT's identification of the incurable flaw in Relator's case. *See* ROA.8863-75.

The district court's only statement on Relator's materiality burden came while rejecting HCAT's new-trial argument that the court improperly refused to instruct the jury on Relator's substantially increased burden when the Government continues to make payments after learning of fraud allegations. ROA.8870. The district court ruled that its "exclusion of a specific instruction on this point did not seriously impair HCAT's ability to make this argument about materiality." *Id.* The Court added that Relator introduced "evidence that these claims would not have been paid had the government known the truth, and that simply being presented with the allegations in this lawsuit would not be enough for Medicare to cease payments as it would instead wait until a final judgment or determination from an enforcement body before stopping payments." *Id.* (citation omitted).

But contrary to the district court's explanation, Relator did not introduce any evidence that "the government" or "Medicare" continues to

27

pay claims even when it views the alleged fraud as material to its decision to pay. For its ruling, the district court referenced only Dr. Lalla's testimony of what *Novitas*, the third-party contractor, would have done in response to learning of Relator's allegations. ROA.8870 (citing ROA.10682:8-15, ROA.10723:17-10824:23). Dr. Lalla is a former employee of Novitas, not the Government. He admitted that he lacked the authority to testify on behalf of the Government, or Novitas for that matter. ROA.10596:16-10597:2. Dr. Lalla testified that, upon learning of fraud allegations, Novitas will continue paying on behalf of the Government until the Government decides to stop paying or a court decides the merits of the allegations. ROA.10723:17-10724:23. Dr. Lalla did not testify that *the Government*, upon learning of fraud allegations, would have continued payments until there was an adjudication on the fraud allegations. In fact, his testimony makes clear that the Government retains the right to decide not to pay claims and to instruct contractors such as Novitas to carry out its decision. Dr. Lalla's testimony is not sufficient to satisfy any materiality standard, let alone the substantially increased burden that applies here.

28

Relator did not introduce any evidence of the Government's practice in this regard. Relator could have called any number of witnesses from the Government (CMS) to testify as to materiality, but Relator decided against doing so. In contrast, in *Aldridge*, the Government intervened and was able to explain why it continued making payments. *See* 78 F.4th at 735-38. That did not happen here. As a result, contrary to what the district court stated, Relator offered nothing to rebut the evidence of the Government's continued payments.

In sum, a relator's burden to prove the already "demanding" materiality requirement "substantially increase[s]" when the evidence shows that the Government continued making payments after it learned of the alleged fraud. Here, Relator presented no evidence to explain how the alleged fraud was material despite the Government's decision to continue to pay HCAT's claims. Consistent with *Harman*, this Court should reverse and render judgment for HCAT.

At a minimum, the Court should vacate the judgment and remand for a new trial because the district court refused to instruct the jury on an

essential part of the materiality standard—*i.e.*, if the Government continues paying claims after learning of noncompliance with a certain requirement, that is "very strong evidence" that the requirement is not material, and continued payment by the Government after it learns of an alleged fraud "substantially increases" the burden on the relator in establishing materiality. *See Harman*, 872 F.3d at 663, 665; *Escobar*, 579 U.S. at 195.

The district court ruled that its exclusion of this part of the materiality standard did not warrant a new trial because HCAT was still able to "bring evidence on this point." ROA.8870. The district court, however, did not address the most pertinent point: the jury was not properly instructed on the law in a way that would allow it to properly *evaluate* the evidence. Juries cannot guess the legal standard or determine it for themselves. They need to be properly instructed on the law, so that they have a framework for evaluating the evidence. "'It is the inescapable duty of the trial judge to instruct the jurors, fully and correctly, on the appliable law of the case, and to guide, direct, and assist them toward an intelligent understanding of the legal and factual issues involved in their search for truth.'" *Pierce v. Ramsey*

30

*Winch Co.*, 753 F.2d 416, 425 (5th Cir. 1985) (quoting 9 C. Wright & A. Miller,

Federal Practice and Procedure: Civil § 2556 (1971)).

Here, the jury was left without needed guidance on how to evaluate

the Government's continued payments. In other words, due to the district

court's exclusion of HCAT's requested jury instruction, the jury was

oblivious to the standard stated by the Supreme Court in *Escobar* and this

Court in *Harman*. Under these circumstances, as this Court has confirmed, a

verdict cannot stand. *See Skidmore*, 188 F.3d at 614 (remanding for new trial

because instruction "ignore[d]" aspect of liability standard); *Kroger Co. v.*

*Roadrunner Tranp., Inc.*, 634 F.2d 228, 230 (5th Cir. 1981) (remanding for new

trial because instruction did not include applicable part of the liability

standard).

**B.    The district court allowed Relator to submit legally invalid theories
to the jury, and it cannot be determined if the verdict was based on
one of the invalid theories.**

Over HCAT's objection, Question No. 1 asked the jury broadly

whether any of the Defendants violated the FCA. *See* ROA.5905-12. This

31

single question encompassed Relator's three separate claims (at least one of which was invalid) that HCAT:

- knowingly presented a false claim to the government;

- knowingly prepared a false record that was material to a false claim; or

- knowingly concealed or improperly avoided an obligation to repay money to the government—*i.e.*, the "reverse false claims' theory.

ROA.5905-07.

Compounding the error, for this same question, the jury was instructed on the seven different categories of alleged "fraud" that Relator initially asserted, *see* ROA.5909, even though Relator advanced only five categories at trial (at least one of which was invalid):

32

| Category | Number of Claims |
|---|---|
| Uncredentialed and unlicensed providers | 9,908 |
| Physical Exam Preparation ("PEP") claims | 3,469 |
| Medical Assistant ("MA") documentation claims | 8,588 |
| Wrong provider ("split billing") claims | 24,740 |
| "Incident-to" claims | 5,985 |

ROA.9951:4-9.[3]

This one question, therefore, spanned at least *15 different theories of liability*. This Court has explained that a single question containing multiple theories of liability is permissible "*only* if each of the several theories is … legally sound." *Nowell v. Universal Elec. Co.*, 792 F.2d 1310, 1312 (5th Cir. 1986) (emphasis added); *Reeves*, 44 F.3d at 303 ("[I]f the court erroneously submitted one of the legal theories of recovery to the jury and the form of the interrogatory prevents us from determining upon which theory the jury

---

[3] As noted, during closing argument, Relator's counsel reduced the number of claims in the "uncredentialed" category to 4,456 and asked the jury to find that Defendants submitted 41,669 total false claims. *See* ROA.11485:6-9.

based its verdict, we must vacate the judgment.") (citing *Pan E. Expl. Co. v. Hufo Oils*, 855 F.2d 1106, 1123 (5th Cir. 1988)).[4]

At bottom, where a court cannot determine whether the jury based its affirmative answer to a general interrogatory on a legally inadequate theory, the district court's verdict must be vacated and remanded for a new trial. Such is the case here. Question No. 1 contained several legally deficient theories, as set forth below.

### 1.    Relator's reverse FCA claim is legally deficient.

Relator's theory based on the alleged failure to repay money owed to the Government (a "reverse FCA claim") is legally deficient and should not have been submitted to the jury. A reverse FCA claim may exist when a party engages in fraudulent behavior to retain money owed to the Government. *See, e.g., U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242 (3d Cir. 2016) (alleging that importer avoided paying customs duties by falsely marking goods). However, courts routinely hold that "a reverse false

---

[4] *See also Walther v. Lone Star Gas Co.*, 952 F.2d 119, 126 (5th Cir. 1992); *Kicklighter v. Nails by Jannee, Inc.*, 616 F.2d 734, 742 (5th Cir. 1980); *Smith v. Southern Airways, Inc.*, 556 F.2d 1347, 1347 (5th Cir. 1977).

claim cannot turn on the same conduct underlying a traditional false claim."

*U.S. ex rel. Foreman v. AECOM*, 19 F.4th 85, 119-20 (2d Cir. 2021); *United States v. Catholic Health Initiatives*, No. 4:18-cv-123, 2022 U.S. Dist. LEXIS 122157, at *31-32 (S.D. Tex. Mar. 31, 2022) (dismissing a reverse FCA claim where the relator acknowledged that the alleged violations pertained to the same money the Government paid in relation to his traditional false claims act claims).

Thus, when a reverse FCA claim is based on a defendant allegedly not repaying money it received from submission of allegedly fraudulent claims, the reverse FCA claim is not actionable as a matter of law. Permitting such claims would expose every FCA defendant to redundant liability for payments it received, which was not Congress's intent in enacting the FCA. *AECOM*, 19 F.4th at 120 (stating that Congress's "'purpose was not to provide a redundant basis to state a false statement claim under subsection (a)(2)'") (quoting *U.S. ex rel. Thomas v. Siemens AG*, 708 F. Supp. 2d 505, 514 (E.D. Pa. 2010)).

35

This established rule precludes Relator's reverse FCA claims here. From the outset of this case, Relator argued that HCAT could be liable under a reverse FCA theory for not refunding money it received from submission of allegedly fraudulent claims. ROA.9350:2-5 (Relator's counsel's opening statement: "It would have been one thing to submit false claims, but there's a separate provision of the False Claims Act that also obligates you to pay back what you got when you shouldn't have."); ROA.9351:7-10 ("And then consider at the end of the day when [Defendants] had been faced with all of that evidence and all those concerns [of false claims] no one did the right thing and paid it back to the government. And that's why we're here.").

Relator did not present any evidence that HCAT had any obligation to pay money to the Government beyond her argument that HCAT should have repaid the money it received for claims that Relator believes were false. For example, there was no evidence that the Government notified HCAT that any of the claims that Relator alleged as false needed to be refunded back to the Government.

Indeed, Relator's counsel left no doubt during closing arguments that Relator's reverse FCA claims are simply the mirror image of her traditional FCA claims (referred to as "presentment" claims):

> [T]he Reverse False Claims Act claims tend to map onto the presentment claims a lot in terms of the evidence that supports them. I submit to you that if you find that the Defendants intentionally submitted those claims, then you also must find that the Reverse False Claims Act elements have been met. It is possible, of course, as the Court charged you, that you could find that the Reverse False Claim[s] Act elements are met without the presentment claim . . . You can choose what to do, of course, in the jury room.

ROA.11483:4-16; *see also* ROA.11491:1-5, 11495:14-18.

Relator's counsel thus compounded this issue by simultaneously arguing to the jury that if it found that HCAT knowingly submitted a false claim, "then *you also must find* that the Reverse False Claims Act elements have been met," and also arguing that the jury could base its verdict entirely upon the reverse false claims action if Relator failed to prove the elements of her presentment claims. ROA.11483:4-16 (emphasis added). In making these arguments, Relator's counsel first encouraged the jury to double count any potential "false" claim by finding liability under both the "presentment"

37

theory and the reverse FCA theory.[5] Relator's counsel then invited the jury to base its verdict solely upon Relator's legally invalid reverse FCA theory. While Relator's arguments are blatant misstatements of the law, the Charge provides no instruction to the jury not to count a single claim more than once, nor did it require the jury to separate the claims it found to be "false" based on either the specific statutory violation (*e.g.*, presentment or reverse FCA claim) or any of Relator's five categories of alleged fraud.

Because Relator's reverse FCA theory is combined with her other theories of recovery, it is impossible for this Court (or anyone) to determine whether the jury's verdict was based (in whole or in part) upon this legally non-viable theory. It is also impossible to determine whether the jury impermissibly assessed liability for the same claim for payment under both the "presentment" theory and the reverse FCA theory—as Relator's counsel urged the jury to do.

---

[5] Relator's invitation for the jury to double count the claims was aggravated by the district court's refusal to use separate interrogatories for the claims and theories on the verdict form.

The district court erred in denying HCAT's new trial motion on this issue. *See* ROA.8863-75. The court acknowledged HCAT's point that a failure to pay back monies received from a previously submitted false claim cannot be a separate liability theory. ROA.8867. The court, however, held that "regardless of whether this assertion is correct in a general sense, here, in this Medicare overpayment context, the applicable law makes it clear that payees have an affirmative duty to repay any overpayments received from Medicare." ROA.8867. The court relied on the FCA provision created by the 2009 FERA amendments, 31 U.S.C. § 3729(b)(3), which defines "obligation" to include a duty arising from "the retention of any overpayment." ROA.8867 (citing 31 U.S.C. § 3729(b)(3)).

No authorities support the district court's ruling that the 2009 FERA amendments changed settled law on reverse false claims involving Medicare payments, and multiple courts have ruled directly to the contrary. For example, in *Sturgeon v. Pharmerica Corp.*, 438 F. Supp. 3d 246 (E.D. Pa. 2020), the court addressed Medicare fraud allegations and recognized that "[t]he established rule prior to the 2009 FERA amendments was that a claim for

39

mere retention of government payments that were fraudulently obtained in the first place did not state a claim under § 3729(a)(1)(G)." *Id*. at 280-81. The court then determined that the 2009 statutory amendment did not alter this analysis. *Id*. at 280, n.233. The court found that "[e]very case the Court is aware of that expressly considered this issue concluded that the rule still applies—relators may not use § 3729(a)(1)(G) as a 'redundant basis' for liability." *Id*. at 280-81 (emphasis added) (citing *United States v. Berkeley Heartlab, Inc.*, 247 F. Supp. 3d 724, 732-33 (D.S.C. 2017) (Medicare case)).[6]

Courts within this Circuit likewise have reaffirmed the bar against asserting duplicative reverse FCA claims after the 2009 statutory amendments—in Medicare cases, just like all other cases. *See, e.g.*, *McClinton v. Southerncare, Inc.*, No. 3:16-cv-128, 2021 U.S. Dist. LEXIS 117055, at *10 (S.D. Miss. June 23, 2021) (holding in a Medicare case: "In cases where a plaintiff

---

[6] *See also U.S. ex rel. Scharber v. Golden Gate Nat'l Senior Care LLC*, 135 F. Supp. 3d 944, 965-66 (D. Minn. 2015) (Medicare case; rejecting argument that 2009 amendment provision changed the bar on redundant reverse claims); *U.S. ex rel. Myers v. America's Disabled Homebound, Inc.*, No. 14-8525, 2018 U.S. Dist. LEXIS 47087, at *10-11 (N.D. Ill. Mar. 22, 2018) (same); *Hawaii ex rel. Torricer v. Liberty Dialysis-Hawaii LLC*, 512 F. Supp. 3d 1096, 1119-20 (D. Haw. 2021) (same).

alleges a reverse false claim by claiming that the defendant fraudulently overcharged the government and then failed to repay the government, courts have consistently dismissed the claim as redundant of false statement and presentment claims.") (citing cases); *U.S. ex rel. Integra Med Analytics, LLC v. Creative Sols in Healthcare, Inc.*, SA-17-CV-1249-XR, at \*36-37 (W.D. Tex. Nov. 13, 2019) (same); *Catholic Health Initiatives*, 2022 U.S. Dist. LEXIS 122157, at \*31-32 (same).

The district court added as justification that it had "instructed the jury not to double-count claims when calculating *damages*,"[7] ROA.8868 (emphasis added), but the district court gave no such instruction regarding the number of false *claims* in Question No. 2.[8] *See* ROA.5913. In any event, the district court's instruction not to double-count claims when calculating damages does not change the fact that the reverse false claims theory was not viable,

---

[7] This would impact the jury's finding of actual damages.

[8] This is a very different issue, because it could potentially impact the amount of statutory penalties.

41

and Relator encouraged (and the Jury Charge allowed) the jury to rely on this theory to find that HCAT submitted false claims.

Because the reverse false claims theory was not viable, and the district court commingled each of the theories into one question in the Jury Charge, the Court must vacate the judgment and order a new trial. *See Reeves*, 44 F.3d at 307 ("Because we cannot determine whether the jury based its affirmative answer to Interrogatory One on Reeves' legally inadequate failure-to-warn theory of recovery, we must vacate the district court's judgment and remand the case for retrial."); *Nowell*, 792 F.2d at 1312, 1318 (vacating judgment and remanding for new trial for same reasons); *Kicklighter*, 616 F.2d at 742, 745 (same); *Smith*, 556 F.2d at 1349 (same).

### 2.    Relator's "split billing" liability theory is legally deficient.

Relator's theory that HCAT listed the "wrong provider" on claims for diagnostic services and laboratory tests (a/k/a engaged in "split billing") is not legally viable, and so inclusion of this theory within a single jury question on whether HCAT violated the FCA warrants a new trial.

42

Claims for ancillary testing (diagnostic services and laboratory tests) may be billed under the provider who rendered the test or the provider who supervised the test. The CMS 1500 Health Insurance Claim Manual instructions expressly state that the Rendering Provider field in Box 24J is "the person or company (laboratory or other facility) who rendered *or supervised* the care."[9] Accordingly, as the district court instructed the jury, "all claims for payment must correctly identify the person who was the 'rendering provider' or 'supervising provider.'" ROA.5908.

Here, every single laboratory claim in evidence shows that HCAT identified both the name of the supervising provider (in the "Rendering Provider" field) and the ordering provider (in the "Referring Provider" field). *See* ROA.16320-30; ROA.10022:5-10025:21. The columns below come from the claim on which Relator relied at trial. Dr. Lawrence treated the patient under the supervision of Dr. Powell, the laboratory director. For the

---

[9] *See* Nat'l. Unif. Claim Comm., *1500 Health Insurance Claim Form Reference Instruction Manual for Form Version 02/12*, at 43 (Version 3.0, July 2015), https://www.nucc.org/images/stories/PDF/1500_claim_form_instruction_manual_2012_02-v3.pdf (emphasis added).

43

laboratory services (the first eight rows), Dr. Powell is listed as the Rendering Provider. For the office visit services that did not involve laboratory services (last two rows), Dr. Lawrence is listed as the Rendering Provider:

| PROCEDURE_DESC | RENDERING_PRACTICE_N | | | REFERRING_PROVIDER_N | | |
|---|---|---|---|---|---|---|
| Complete blood cell count (red cells- white blood cell- | POWELL | CHARLES | LMD | LAWRENCE | NEAL | CMD |
| Blood test- comprehensive group of blood chemicals | POWELL | CHARLES | LMD | LAWRENCE | NEAL | CMD |
| MAGNESIUM | POWELL | CHARLES | LMD | LAWRENCE | NEAL | CMD |
| PHOSPHORUS INORGANIC (PHOSPHATE) | POWELL | CHARLES | LMD | LAWRENCE | NEAL | CMD |
| Blood test- thyroid stimulating hormone (TSH) | POWELL | CHARLES | LMD | LAWRENCE | NEAL | CMD |
| Thyroxine (thyroid chemical)- free | POWELL | CHARLES | LMD | LAWRENCE | NEAL | CMD |
| Thyroid hormone- T3 measurement- free | POWELL | CHARLES | LMD | LAWRENCE | NEAL | CMD |
| COLLECTION OF VENOUS BLOOD BY VENIPUNCTURE | POWELL | CHARLES | LMD | LAWRENCE | NEAL | CMD |
| Established patient office or other outpatient visit- 30-39 | LAWRENCE | NEAL | CMD | LAWRENCE | NEAL | CMD |
| Preparation of special reports beyond what is found in the | LAWRENCE | NEAL | CMD | LAWRENCE | NEAL | CMD |

ROA.16325-26 (image above showing three of the columns).

Relator's argument that HCAT improperly "split-billed" claims for these services relies on the non-existent requirement that the supervisor under whom the claim was billed must have been directly involved in the care of the patient on the date of service—that is, Relator argued that Dr. Powell was not actually supervising these diagnostic services and laboratory tests (such that he could be listed on the claim) if he was not directly involved in the patient's care that day. *See* ROA.9908:15-9910:14 (Relator's expert Melissa Scott testifying that Dr. Powell was required to be directly involved in the patient's care to be the supervisor under whom the claims were billed).

Relator's theory does not comport with the supervision requirements governing diagnostic services and laboratory tests. *See* 42 C.F.R. § 410.32(b). Although the required level of supervision varies depending on the Current Procedural Terminology Code, most diagnostic services and laboratory tests are subject to *general supervision*. *See id.* § 410.32(b)(3). This means that the procedures must be "furnished under the physician's overall direction and control, but the *physician's presence is not required* during the performance of the procedure." *Id.* § 410.32(b)(3)(i) (emphasis added).

Despite the fatal problem in Relator's theory, the district court permitted Relator to argue that HCAT improperly submitted 24,740 "split-billing" claims. ROA.9951:4-9, 5909. The district court also refused to separate any liability questions so that it could be determined whether the jury relied on this legally non-viable theory. *See* ROA.5905, 5909. In denying HCAT's new trial motion, the district court barely acknowledged the relevant authorities and instead referred to its entry-of-judgment opinion, ROA.8868, where the court stated that Relator "introduced evidence of a claim for laboratory services … that identified Dr. Powell as the 'rendering

45

provider' while the medical chart for the patient showed Dr. Powell had not participated in the patient's care, and instead Dr. Lawrence had ordered the test." ROA.6045.

The district court's reasoning, however, is directly contrary to the applicable regulations and the district court's own jury instructions. As discussed, the claim is properly submitted if it identifies the provider who rendered *or supervised* the care, ROA.5908, and the supervising provider on the claim is "not required" to be present during the performance of the procedure. 42 C.F.R. § 410.32(b)(3)(i). Even if the law were otherwise, there was no attempt to deceive anyone and thus no scienter. It is apparent on the face of the documents that Dr. Lawrence (and not Dr. Powell) was the ordering provider who treated the patient. *See* ROA.16320-30; ROA.10022:5-10025:21.

Because Relator's split-billing theory was not viable, and the district court commingled all of the legal theories and assertions of fraud into one question in the Jury Charge, the Court must vacate the judgment and order

46

a new trial. *See Reeves*, 44 F.3d at 307; *Nowell*, 792 F.2d at 1312, 1318; *Kicklighter*, 616 F.2d at 742, 745; *Smith*, 556 F.2d at 1349.

### 3.    Relator's "incident-to" liability theory is legally deficient.

Relator's "incident-to" theory is not legally viable, and so inclusion of this liability theory within a single jury question on whether HCAT violated the FCA warrants a new trial.

Medicare covers services rendered "incident to" the services of a physician or other practitioner, provided that certain requirements are satisfied. *See* 42 C.F.R. § 410.26(b). The purpose of the "incident to" rules is to permit services to be provided in connection with the overall care of the patient. To bill "incident to," the services must be (1) furnished in a non-institutional setting to non-institutional patients, (2) an integral, though incidental, part of the service of a physician (or other practitioner) in the course of diagnosis or treatment of an injury or illness, (3) commonly furnished without charge or included in the bill of a physician, and (4) of the type that are commonly furnished in the office or clinic of a physician. *See* 42 C.F.R. § 410.26(b).

Medicare reimburses "incidental" services performed by a "physician," or other "practitioner" (*i.e.*, non-physician), or "auxiliary personnel" (*i.e.*, any individual who is acting under the supervision of a physician). 42 C.F.R. § 410.26(a)(1), (a)(7), (b)(1)-(9). The incident-to regulations make clear that "[t]he physician (or other practitioner) supervising the auxiliary personnel *need not be the same physician (or other practitioner) who is treating the patient more broadly*." 42 C.F.R. § 410.26(b)(5) (emphasis added). To be engaged in direct supervision for purposes of the incident-to regulations, the supervising physician simply must be "present in the office suite and immediately available to furnish assistance," 42 C.F.R. § 410.26(a)(2), § 410.32(b)(3)(ii), ROA.1025, 10917:13-17, and the supervising physician can be the physician identified on the claim. ROA.10922:22-10923:25.

At trial, Relator advanced her incident-to theory based on the incorrect premise that incident-to billing required the supervising physician to sign the medical records for the treatment provided under their supervision. ROA.9966:11-9967:24. But the incident-to regulations require no such thing.

48

*See* 42 C.F.R. § 410.26. Similarly, Relator relied on the incorrect premise that the supervising physician must be involved in the patient's care on the date of service. ROA.9920:5-9921:14. But that is not the law. The incident-to regulations define "direct supervision" to mean that the supervising physician must be "present in the office suite and immediately available to furnish assistance," 42 C.F.R. § 410.26(a)(2), § 410.32(b)(3)(ii), ROA.10917:13-17, and Relator did not even attempt to show that the supervising physician on the claim did not satisfy this requirement.

The district court erred in denying HCAT's new trial motion on this point. In fact, in denying HCAT's new trial motion, the court barely acknowledged the applicable law and instead referred to its entry-of-judgment opinion, which also failed to engage with the applicable incident-to regulations. *See* ROA.8868 (citing ROA.6046).

Because Relator's incident-to liability theory was not viable, and the district court combined all of the legal theories and assertions of fraud into one question in the Jury Charge, the Court must vacate the judgment and

order a new trial. *See Reeves*, 44 F.3d at 307; *Nowell*, 792 F.2d at 1312, 1318; *Kicklighter*, 616 F.2d at 742, 745; *Smith*, 556 F.2d at 1349.

**4.     Relator's "uncredentialed" liability theory is legally deficient.**

Relator's theory that certain physicians were "uncredentialed" is not legally viable, and so inclusion of this liability theory within a single jury question on whether HCAT violated the FCA warrants a new trial.

To argue that HCAT submitted "uncredentialed" claims, Relator and her expert, Ms. Scott, relied on HCAT's alleged non-compliance with "PTAN [Provider Transaction Access Number] assignment dates." ROA.9813:15-9814:3. Ms. Scott stated her belief "that if a provider is not properly connected to a PTAN that Medicare would deny the claim." ROA.9986:20-23. Ms. Scott conceded, however, that the Code of Federal Regulations makes no reference to PTANs. ROA.9987:3-4. Ms. Scott also conceded that her understanding was based on Chapter 10 from the Medicare Program Integrity Manual that *was not issued until 2024*. ROA.9987:18-9988:14; *see* ROA.12417-13357. Relator introduced no evidence that the versions of the Medicare Program Integrity Manual in effect from 2015 to 2021, the relevant

period, contained a similar provision to the one upon Ms. Scott relied in the 2024 version, and that is because they did not.

In connection with Ms. Scott's opinion, Relator requested an instruction that Medicare rules "required the provider to have a PTAN associated with the PTAN of the HCAT location at which the provider practiced." ROA.4834. The district court rejected Relator's proposal for the jury charge. *See* ROA.5899-5924. The district court, however, permitted Relator to submit her "credentialing" allegations to the jury as part of the jury's consideration of whether HCAT violated the FCA and how often. ROA.5909. Despite the jury instruction that foreclosed the "uncredentialed" claims theory tried by Relator, the jury was nonetheless permitted to consider whether Relator proved 9,908 "uncredentialed" claims. ROA.9951:4-9.

The district court erred in denying HCAT's new trial motion on this point, ROA.8868, relying on its prior reasoning that, regardless of Relator's deficient argument on the PTANs, "there is sufficient evidence in the record to support a finding that these claims were false" because "the jury saw a

claim that was submitted under the name of Dr. Anderson, but the medical notes showed that Deborah Croissant [who was not yet credentialed], not Dr. Anderson, performed all of the patient care that day." ROA.6046-47. However, as explained above, under the incident-to regulations, it was proper for the claim to be submitted under the name of Dr. Anderson, the supervising physician who was "present in the office suite and immediately available to furnish assistance." 42 C.F.R. §§ 410.26(a)(2), 410.32(b)(3)(ii), ROA.10917:13-17. Relator presented no evidence that Dr. Anderson was not present and available during the relevant period of care.

Because Relator's "uncredentialed" liability theory was not viable, and the district court combined all of the legal theories and assertions of fraud into one question in the Jury Charge, the Court must vacate the judgment and order a new trial. *See Reeves*, 44 F.3d at 307; *Nowell*, 792 F.2d at 1312, 1318; *Kicklighter*, 616 F.2d at 742, 745; *Smith*, 556 F.2d at 1349.

\* \* \*

In sum, Relator was permitted to combine numerous theories of liability in a single question on the Jury Charge. There is no evidence on

which this Court or any reviewing court could determine whether the jury's finding was based—in whole or in part—on legally non-viable theories. This is particularly true because the number of claims the jury found to be "false" (21,844) bears no logical relationship to the discrete categories of allegedly "false" claims alleged by Relator. In other words, there is no combination of any of the five categories about which Realtor's experts opined that results in a total number of 21,844 claims. This fact underscores the likelihood that the jury double counted claims under Relator's "presentment" FCA theory and her reverse FCA theory (as Relator's counsel improperly suggested it should do).

C.    **The FCA's qui tam device violates Article II's Vesting and Take Care Clauses as well as the Appointment Clause.**

The FCA's *qui tam* device allows individuals such as Relator Cheryl Taylor to sue for injuries to the Government's fisc and sovereignty, despite such individuals having suffered no injury of their own. Relators may initiate litigation in the Government's name, shape the Government's legal positions, and bind the Government through judgments, and their actions are backed by the threat of treble damages and civil penalties. Yet relators

53

are neither properly appointed nor meaningfully controlled by the Executive Branch. Numerous courts and other authorities have recognized the constitutional infirmities inherent in the FCA's *qui tam* device, both in relation to Article II's Vesting and Take Care Clauses and Article II's Appointments Clause.

*In 1989*, after the 1986 amendments to the FCA "resuscitat[ed] the dormant qui tam device," the DOJ's Office of Legal Counsel concluded that this private enforcement scheme for the vindication of public rights is "patently unconstitutional." *Constitutionality of the Qui Tam Provisions of the False Claims Act*, 13 Op. O.L.C. 207, 209, 238 (1989) (William Barr, Ass't Att'y Gen.).[10]

*In 2000*, the Supreme Court expressly reserved the question whether the FCA's *qui tam* device conflicts with Article II. *See Vermont Agency of Natural Resources v. U.S. ex rel. Stevens*, 529 U.S. 765, 778 n.8 (2000).

---

[10] The OLC later took a different view. *See The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 142 n.52 (1996); *Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 77 (2007). However, the Office's original position in 1989 was correct and consistent with Supreme Court precedent.

54

*In 2023*, several members of the Supreme Court recognized that there are "substantial arguments" that the FCA's *qui tam* device is "inconsistent with Article II." *U.S. ex rel. Polansky v. Executive Health Resources, Inc.¸* 599 U.S. 419, 442 (2023) (Kavanaugh, J., joined by Barrett, J., concurring); *id.* at 449 (Thomas, J., dissenting); *see also Wisconsin Bell, Inc. v. U.S. ex rel. Heath*, 145 S. Ct. 498, 515 (2025) (Kavanaugh, J. ,joined by Thomas, J., concurring).

*In 2024*, the United States District Court for the Middle District of Florida held that the FCA's *qui tam* device violates the Appointments Clause and dismissed the FCA *qui tam* case filed by a relator. *See U.S. ex. rel. Zafirov v. Florida Medical Assocs., LLC*, 751 F. Supp. 3d 1293 (M.D. Fla. 2024), on appeal No. 24-13581 (11th Cir.).

*In 2025*, Judge Duncan of this Court authored a concurrence in *United States ex rel. Montcrief v. Peripheral Vascular Assocs., P.A.*, 133 F.4th 395 (5th Cir. 2025), "to point out the constitutional flaws in the FCA's *qui tam* device" in terms of the Take Care Clause and the Appointments Clause. *Id.* at 410. As Judge Duncan explained, "[a] Constitution like ours—one that vests *all* federal executive power in a President—does not allow this outsourcing of

55

prosecutorial power to a private person … [y]et that is precisely what happens when a private person brings a *qui tam* action under the FCA." *Id.* at 412.

***Also in 2025***, Judge Ho of this Court authored a concurrence in *United States ex rel. Gentry v. Encompass Health Rehab. Hosp. of Pearland, L.L.C.*, 157 F.4th 758, 766 (5th Cir. 2025), to state that this Court "should revisit whether there are serious constitutional problems with the *qui tam* provisions of the False Claims Act." *Id.* As Judge Ho explained, FCA *qui tam* relators "presume to represent the United States government in federal court, and to defend the interests of the United States Treasury against fraud. But like federal civil servants, they are neither appointed by, nor accountable to, the President. So it's not surprising that many members of the federal judiciary have expressed repeated constitutional concerns about the *qui tam* provisions of the False Claims Act." *Id.*

As explained below, the FCA's *qui tam* device violates multiple provisions of Article II of the U.S. Constitution: (1) the Vesting and Take Care Clauses; and (2) the Appointments Clause.

1. **The FCA's *qui tam* device violates the Vesting and Take Care Clauses.**

The Vesting Clause of Article II provides that "[t]he executive Power shall be vested in a President of the United States of America," U.S. Const. art. II, § 1, and the Take Care Clause of Article II provides that the President "shall take Care that the Laws be faithfully executed." U.S. Const. art. II § 3. Under these provisions, the President possesses the "exclusive authority" to determine whether to commence civil or criminal legal action on behalf of the Government. *Buckley v. Valeo*, 424 U.S. 1, 135-38 (1976); *see also Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020) ("Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'") (quoting U.S. Const. art. II, § 1, cl. 1). While the President may delegate power to Officers of the United States, the President must always be able to "oversee the faithfulness of the officers who execute them." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 484 (2010). The President must be the one exercising "sufficient control" over the litigation of the Government. *Morrison v. Olson*, 487 U.S. 654, 696 (1988). There are good reasons for this design. "Private plaintiffs are not accountable

57

to the people and are not charged with pursuing the public interest in enforcing a defendant's general compliance with regulatory law." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021).

The FCA's *qui tam* device, however, permits relators to maintain primary control over litigation on behalf of the Government. Here, Relator has been given "the primary responsibility for prosecuting the action." 31 U.S.C. § 3730(c)(1). Despite being unappointed, Relator has sued "in the name of the Government" and is exercising control over this litigation. 31 U.S.C. § 3730(b)(1). In this scenario, the Government does not "control" the litigation and is not "taking care" to ensure that the laws are faithfully executed. To the contrary, Relator is pursuing theories of liability that are inconsistent with the law.[11] Yet, the Government may not remove Relator

---

[11] As discussed above, Relator pursued multiple theories of liability that are inconsistent with (or downright contrary to) the law. As just one example, Relator's expert, Melissa Scott, testified that HCAT violated a regulatory requirement that simply does not exist: she stated that Medicare's "incident to" rules require that the physician who "supervises" the incident to service must be involved in the patient's care. *See* ROA.9908:16-9910:14. In fact, Medicare regulations say the exact opposite. *See* 42 C.F.R. § 410.26(b)(5) ("The physician (or other practitioner) supervising the auxiliary personnel

from her role litigating on the Government's behalf. *See Riley*, 252 F.3d at 763 & n.32 (Smith, J., dissenting) (noting that, under 31 U.S.C. § 3730(c), "the Executive has no power to remove the relator from the litigation under any circumstances"); *Free Enter. Fund*, 561 U.S. at 493 (noting that the "President … must have some 'power of removing those for whom he can not [sic] continue to be responsible'"). The FCA's *qui tam* device thus strips the President of authority to make decisions about government suits.

Congress's delegation of that authority to a self-appointed relator without political accountability is unconstitutional. Concurring recently in *Montcrief*, Judge Duncan explained that the *qui tam* device violates the Take Care Clause, and he identified the realities of what the *qui tam* device allows:

> Without any green light by the President or his agents, [Relator] launched an enforcement action on behalf of the United States. The United States decided to stay in the bullpen. So, [Relator] pressed forward on her own steam—without government oversight—for seven years, eventually obtaining a multi-million dollar verdict.

---

need not be the same physician (or other practitioner) who is treating the patient more broadly.").

*Montcrief*, 133 F.4th at 412 (Duncan, J., concurring). It's the same situation here. As described by Judge Duncan in *Montcrief*, "[t]his case puts the FCA's flaws on vivid display." *Id.*

In addressing the constitutionality of the FCA's *qui tam* device before the Eleventh Circuit, the Government recently conceded that "If Congress's use of the qui tam mechanism were a new development, these features of qui tam actions under the False Claims Act would give rise to substantial questions about whether such actions are consistent with the Vesting and Take Care Clauses of Article II." *U.S. ex rel. Zafirov v. Florida Medical Associates, LLC*, No. 24-13581, 2025 U.S. 11th Cir. Briefs LEXIS 2287 (11th Cir. Apr. 30, 2025), Reply Brief of United States at p. 13. In defense of the *qui tam* device, the Government argued only that "Congress and the courts have not historically viewed qui tam suits as inconsistent with those Article II provisions." *Id.*

The Supreme Court, however, has long explained that, "[s]tanding alone, historical patterns cannot justify contemporary violations of constitutional guarantees" even if those patterns cover "our entire national

60

existence and indeed predate[] it." *Marsh v. Chambers*, 463 U.S. 783, 790 (1983) (citation omitted). Of course, history can be relevant to constitutional interpretation. At the same time, however, past actions "taken thoughtlessly, before force of long tradition"—as opposed to those that were "considered carefully"—are entitled to little weight. *Id.* at 791.

While Relator and the Government may point to British practice and various early American *qui tam* statutes, there is no evidence that the founding generation considered whether *qui tam* suits violate Article II. Accordingly, that historical practice reflects actions "taken thoughtlessly, by force of a long tradition"—or perhaps from "expediency"—rather than "from reasoned constitutional analysis." *Marsh*, 463 U.S. at 790; *Riley*, 252 F.3d at 773 (Smith, J., dissenting); *Polansky*, 599 U.S. at 450 (Thomas, J., dissenting). Nor does the irregular history of *qui tam* suits from the founding through 1986 amount to the type of "unambiguous and unbroken history" that shows that such suits have "become part of the fabric of our society." *Marsh*, 463 U.S. at 792. To the contrary, federal *qui tam* provisions faded away as the Constitution's separation of powers took hold, leaving the post-1986

FCA an anomaly of today. *See* Charles Doyle, Congressional Research Service, R40785, *Qui Tam: The False Claims Act and Related Federal Statutes* 4 (Apr. 26, 2021).

At bottom, *qui tam* relators act based on the "prospects of monetary reward" and even "personal ill will," rather than "the public good." *Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939, 949 (1997) (citation omitted). That arrangement plainly prevents the President from fulfilling his "constitutional obligation to ensure the faithful execution of the laws" and thus contravenes the Vesting and Take Care Clauses. *Free Enterprise Fund*, 561 U.S. at 484 (citation omitted).

### 2. The FCA's *qui tam* device violates the Appointments Clause.

The Appointments Clause requires that all "Officers of the United States" be appointed by the President, with the advice and consent of the Senate, or in the case of inferior officers, by Heads of the Executive Departments, if Congress so provides. *See* U.S. Const. art. II, § 2, cl. 2. The Supreme Court deems an individual an officer of the United States if she (1) "exercis[es] significant authority pursuant to the laws of the United

States," *Lucia v. SEC*, 585 U.S. 237, 245 (2018) (quoting *Buckley*, 424 U.S. at 126), and (2) "occup[ies] a 'continuing' position established by law,' *id.* (quoting *United States v. Germaine*, 99 U.S. 508, 511 (1879)). Both of those elements are present here.

*First*, an FCA relator exercises significant authority under the laws of the United States. In *Buckley*, the Supreme Court explained that an official vested with the power to "conduct[] civil litigation in the courts of the United States for vindicating public rights" must be an officer under the Appointments Clause. 424 U.S. at 140.

An FCA relator meets this standard—an FCA relator unquestionably "conduct[s] civil litigation in the courts of the United States for vindicating public rights." *Id.* A relator may file a complaint, without *ex ante* oversight by the Government, and thereby initiate an action on behalf of the United States for treble damages and substantial statutory penalties. 31 U.S.C. §§ 3729(a)(1), 3730(b). That act precludes all but the Attorney General from "interven[ing] or bring[ing] a related action based on the facts underlying" the complaint. *Id.* § 3730(b)(5).

63

The filing of the complaint also begins a 60-day seal period during which the government investigates both the claims and the relator and determines whether to intervene. *Id.* § 3730(b)(2). That ticking clock forces the Executive Branch to align its investigative priorities with those of a self-interested third party. If the Government does not intervene, the relator may prosecute her action to final judgment however she chooses, including litigating an appeal that can become binding precedent on the Government. *Id.* § 3730(b)(4). That is textbook "significant authority." *Buckley*, 424 U.S. at 126, 138-39.

In some respects, a relator has even greater authority than other officials whose power has been deemed significant. Unlike the independent counsel in *Morrison*, for example, a relator does not need their appointment to be authorized by an officer accountable to the President before suing and cannot be removed by such an officer. *See* 487 U.S. at 660-61, 671. And whereas the independent counsel's jurisdiction was specifically defined, *see id.* at 672, a relator determines the limits of the complaint. Likewise, unlike the members of the Federal Election Commission in *Buckley*, relators face

none of the institutional constraints of multimember boards: a relator has "no colleagues to persuade" and so may act "unilaterally." *Seila Law LLC*, 591 U.S. at 225. Since those officials exercise significant authority, *qui tam* relators plainly do too.

Concurring in *Montcrief*, Judge Duncan explained that the *qui tam* device violates the Appointments Clause, and he described the *qui tam* relator's exercise of significant authority pursuant to the laws of the United States:

> [C]onsider what Montcrief, a private person, did here. She 'conduct[ed] civil litigation … for vindicating public rights' by initiating an enforcement action against PVA on behalf of the United States, with zero front-end executive review. The United States then refused to intervene. Under that circumstance, the FCA let Montcrief take the 'lead role' in litigating the case. The upshot: Montcrief 'exercise[d] core executive power by deciding how to prioritize and how aggressively to pursue legal actions' against PVA.

*Montcrief*, 133 F.4th at 411 (Duncan, J., concurring). It's the same situation here. The name "Taylor" can be substituted for the name "Montcrief" in Judge Duncan's opinion, and it would be perfectly accurate.

Additionally, in 2024, the Middle District of Florida held that the *qui tam* device violates the Appointments Clause. *See Zafirov*, 751 F. Supp. 3d 1293. That court, too, described the relator's exercise of significant authority under the laws of the United States:

> Zafirov has determined which defendants to sue, which theories to raise, which motions to file, and which evidence to obtain. If the action proceeds to an appeal, Zafirov will decide which arguments to preserve, further binding the federal government. Yet no one—not the President, not a department head, and not a court of law—appointed Zafirov to the office of relator. Instead, relying on an idiosyncratic provision of the False Claims Act, Zafirov appointed herself. This she may not do.

*Id.* at 1300. Again, it's the same situation here.

**Second**, an FCA *qui tam* relator occupies a continuing position established by law. The "continuing position" inquiry "stress[es] 'ideas of tenure [and] duration" and asks whether the position is impersonal, durable, and statutory, rather than personal transient, and discretionary. *Lucia*, 585 U.S. at 245 (quoting *Germaine*, 99 U.S. at 511-12).

FCA *qui tam* relators occupy a "continuing position" under any sensible understanding of that concept. They bring suit in the impersonal name of the Government, and they may be replaced in their duties by others.

66

*See Stevens*, 529 U.S. at 771-74. They perform functions that are expressly authorized and regulated by the FCA, rather than *ad hoc* duties only as assigned. *See* 31 U.S.C. § 3730(b)-(c). They receive statutorily defined compensation. *See* 31 U.S.C. § 3730(d). They initiate and prosecute actions that may span many years with lasting and preclusive effects. That regime "persists by operation of the FCA" beyond any particular relator or case; the office of relator is "continuous even if it is not continually filled," *Zafirov*, 751 F. Supp. 3d at 1314, and it is generally held at any given time by numerous private parties conducting litigation on behalf of the Government.

In these respects, relators are materially identical to other officials whom courts have recognized as officers. In *Morrison*, for example, the Court found it "clear" that an independent counsel was an officer, even though she was authorized to investigate and prosecute only a single individual. *See* 487 U.S. at 666-68, 671 n.12, 672; *id.* at 715 (Scalia, J., dissenting). Following *Morrison*, lower courts have repeatedly held that special prosecutors and similar individuals are officers, even though they act in only a single matter. *See, e.g., United States v. Donziger*, 38 F.4th 290, 296-99 (2d Cir. 2022); *In re*

67

*Grand Jury Investigation*, 916 F.3d 1047, 1052-53 (D.C. Cir. 2019). Accordingly, both requirements for a relator to be deemed an officer of the United States for purposes of the Appointments Clause are satisfied.

Contrary to arguments raised in support of the *qui tam* provision, a continuing position does not require a formalized relationship of employment with the United States Government. The Supreme Court has never held that a formalized relationship of employment with the Government was required. Permitting Congress to delegate Executive Power to unappointed individuals so long as they are private citizens and not Government employees would severely undermine separation-of-powers principles. *See Freytag v. Comm'r*, 501 U.S. 868, 880 (1991) (noting that "[t]he Appointments Clause prevents Congress from dispensing power too freely").

\* \* \*

For each one of these independent reasons, the FCA's *qui tam* device is facially unconstitutional—*i.e.*, "no set of circumstances exists under which the [law] would be valid." *Reed v. Goertz*, 136 F.4th 535, 542 (5th Cir. 2025).

At a minimum, the *qui tam* device is unconstitutional as applied to cases, like this one, where the Government declines to intervene—*i.e.*, the "particularities of [the] circumstances" show the *qui tam* device to be unconstitutional. *Id.* Either way, dismissal of Relator's claims and judgment for HCAT is warranted. *See Zafirov*, 751 F. Supp. 3d at 1300 ("[Relator] exercises significant authority, indeed core executive power, under the continuing position of relator but lacks proper appointment under the Constitution. As a result, the case must be dismissed.").

3. **This panel should vote for the entire Court to address this issue.**

The district court ruled that HCAT's arguments on the *qui tam* device's violation of Article II were foreclosed by this Court's decision in *Riley v. St. Luke's Episcopal Hospital*, 252 F.3d 749 (5th Cir. 2001). ROA.8875. To the extent this panel concludes that the constitutional issues are controlled by *Riley*, HCAT respectfully requests that the panel (or any individual panel member) request a poll for the entire Fifth Circuit to hear this issue *en banc*. The Court's Internal Operating Procedure associated with Federal Rule of Appellate Procedure 40 states:

69

> Requesting a Poll on Court's Own Motion – Any active member of the Court or any member of the panel rendering the decision may request a poll of the active members of the Court whether rehearing en banc should be granted, whether or not a party filed a petition for rehearing en banc. A requesting judge ordinarily sends a letter to the Chief Judge with copies to the other active judges of the Court and any other panel member.

Fed. R. App. P. 40, 5th Cir. IOP.

*En banc* consideration is warranted on this issue, as recognized recently by Judge Duncan and Judge Ho. *See Montcrief*, 133 F.4th at 410 (Duncan, J., concurring) (identifying the "constitutional flaws in the FCA's *qui tam* device" and the need to address the Court's prior decision in *Riley*); *Gentry*, 157 F.4th at 767 (Ho, J., concurring) ("Judge Duncan has already called on our court to revisit *Riley.* Had I been on that panel, I would have joined him. I'm pleased to do so now.") (citation omitted).[12]

---

[12] The panel could resolve this appeal in favor of HCAT in a manner that does not reach the issue of whether the FCA's *qui tam* device is constitutional. To the extent the Court's consideration of the other issues does not lead the Court to reverse and render for HCAT, *en banc* consideration of the constitutional issue is warranted.

70

## Conclusion

This Court should reverse and render judgment for HCAT. Alternatively, this Court should vacate the judgment and remand for a new trial.

Dated:  January 20, 2026

Respectfully submitted,

/s/ *R. Alan York*

| | |
|---|---|
| Elizabeth C. Brandon | R. Alan York |
| Sarah Cummings Stewart | REED SMITH LLP |
| E. Steve Smith | 1221 McKinney St. #2100 |
| REED SMITH LLP | Houston, TX 77010 |
| 2850 N. Harwood Street, Suite 1500 | Tel: (713) 469-3800 |
| Dallas, TX 75201 | ayork@reedsmith.com |
| Tel: (469) 680-4200 | |
| ebrandon@reedsmith.com | R. Jeffrey Layne |
| sarah.stewart@reedsmith.com | REED SMITH LLP |
| stevessmith@reedsmith.com | 401 Congress Avenue, Suite 1800 |
| | Austin, TX 78701 |
| Kristin B. Parker | Tel: (512) 623-1801 |
| REED SMITH LLP | jlayne@reedsmith.com |
| 599 Lexington Avenue | |
| New York, NY 10022 | M. Patrick Yingling |
| Tel: (212) 521-5400 | REED SMITH LLP |
| kparker@reedsmith.com | 10 S. Wacker Dr., 40th Fl. |
| | Chicago, IL 60606 |
| | Tel: (312) 207-2834 |
| | mpyingling@reedsmith.com |

## Certificate of Service

I, R. Alan York, an attorney, certify that on January 20, 2026 the foregoing Opening Brief of Defendant-Appellant was served electronically via CM/ECF on all counsel of record, including counsel for Relator and the United States:

Robert W. Gifford, Esq.
Catherine Elizabeth Gaither
Johnston Clem Gifford, P.L.L.C.
2000 McKinney Avenue, Suite 2050
Dallas, TX 75201-2011
rgifford@johnstonclem.com
kgaither@johnstonclem.com
*Counsel for Relator*

Daniel Winik
U.S. Department of Justice Civil Division, Appellate Section
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
daniel.l.winik@usdoj.gov
*Counsel for United States*

/s/ R. Alan York
*Counsel for Defendant-Appellant*

**Certificate of Compliance**

Pursuant to Fed. R. App. P. 32(a)(7)(C), undersigned counsel certifies that I have complied with the above-referenced rule, and that according to the word processor used to prepare this brief, Microsoft Word, this brief contains 12,978 words (including words in images) and therefore complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).

Moreover, this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word software in Palatino Linotype 14-point font in text and footnotes.

*/s/ R. Alan York*